IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 25, 2005

## STATE OF TENNESSEE v. JOE MAC PEARSON

**Direct Appeal from the Circuit Court for Marshall County**
**No. 15896    Charles Lee, Judge**

---

**No. M2004-03074-CCA-R3-CD - Filed January 5, 2006**

---

The appellant, Joe Mac Pearson, was convicted by a jury in the Marshall County Circuit Court of selling a Schedule II controlled substance, namely oxycodone, and he received a sentence of ten years in the Tennessee Department of Correction. On appeal, the appellant challenges the sufficiency of the evidence supporting his conviction and the sentence imposed. Upon our review of the record and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed**.

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which DAVID G. HAYES and JOHN EVERETT WILLIAMS, JJ., joined.

Andrew Jackson Dearing, III, Shelbyville, Tennessee, for the appellant, Joe Mac Pearson.

Paul G. Summers, Attorney General and Reporter; Blind Akrawi, Assistant Attorney General; W. Michael McCown, District Attorney General; and Weakley E. Barnard, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

At trial, Shane George, an officer with the Shelbyville Police Department assigned as an agent with the 17th District Drug Task Force, testified that for a period of eight months to a year, the task force utilized the services of a confidential informant, Timothy Lee Little.[1] Agent George stated that Little was usually paid fifty or sixty dollars for each undercover drug purchase he made for the task force. Approximately six months after Little began making undercover purchases for the task force, Little gave police information indicating the appellant's involvement in drugs. Accordingly,

---

[1] Little was also known by the names "Tim Little" and "Tim Bone." Little passed away several months prior to trial.

the task force began a "targeting effort" to catch the appellant.

At 5:30 p.m. or 6:00 p.m. on November 13, 2002, Little, Agent George, Agent Bill Ostermann, and Agent Tim Miller met at the Industrial Park in Lewisburg to coordinate efforts to purchase Oxycontin, a Schedule II drug, from the appellant. Agent George searched Little's person and his vehicle for money or contraband and found none. Because the audio equipment the task force ordinarily used to record drug purchases was not working, Little was equipped with a microcassette recorder. Additionally, Little was given sixty dollars of task force money. At that time, Agent George was working in an undercover capacity, and the decision was made that he would accompany Little during the purchase to help ensure that the purchase would be made safely. Little and Agent George drove to 803 Marshall Street, the appellant's address, with Agents Ostermann and Miller following.

Little and Agent George arrived at the residence. Agent George saw several cars parked at the residence. Little and Agent George got out of the vehicle and walked to the front porch. Little knocked on the front door, and the appellant answered the door. Little went into the residence first, with Agent George immediately behind him. Two unidentified white males were in the residence, sitting on the couch. Little asked the appellant to step outside, and all of the men followed.

Once outside, the men walked toward Little's vehicle. Little told the appellant that he had been having problems with his car, and he asked for suggestions as to how to remedy the problems. Little then asked the appellant "for four of those," meaning Oxycontin pills. Agent George testified that there was no conversation regarding the price of the pills; it was "understood" that the cost was fifteen dollars per pill. All of the men returned inside the residence, and the appellant went to a small table located beside a recliner in the living room. From the table, the appellant picked up a medicine bottle, removed four yellow pills which appeared to be Oxycontin, and handed the pills to Little. The appellant then looked at Agent George, who explained that "two of those are mine." Agent George looked at the pills and told Little that the pills looked good so he should pay the appellant. Little pulled the sixty dollars of task force money from his pocket and handed it to the appellant. Agent George saw the appellant take the money, but he did not see what the appellant did with it. Little kept two of the pills and gave the other two pills to Agent George.

Little told the appellant that he was concerned because his car had been overheating and asked the appellant if he could borrow a water hose. The appellant showed Little where the water hose was located. While Little went to take care of his vehicle, he handed his two Oxycontin pills to Agent George. Agent George put the four pills into his pocket. The appellant, Little, and Agent George went outside. After Little put water into his car, he and Agent George left the appellant's residence, followed by Agents Ostermann and Miller. Upon their arrival at the industrial park, Agent George again searched Little. He found no money or contraband. Agent George took possession of the microcassette recorder. Upon returning to task force headquarters, Agent George relinquished custody of the four Oxycontin pills to Director Tim Lane.

Agent Tim Miller was the next witness to testify. Agent Miller explained that he was

2

employed by the Lincoln County Sheriff's Department, but he was assigned to work as an agent with the 17th District Drug Task Force. Agent Miller was the assistant director of the task force. Agent Miller testified that Little had not been "working off charges"; instead, Little had approached police about helping to make undercover drug purchases, and he was referred to Agent Miller.

Agent Miller stated that he was present at the industrial park on November 13, 2002, on both occasions when Agent George searched Little. Agent Miller opined that each search was thorough. Agent Miller maintained that he followed Little and Agent George during the operation, and he kept them in sight as much as possible.

Agent Miller recalled that the appellant was arrested on October 1, 2003. On October 3, 2003, the appellant's wife, Charlotte Pearson, called Agent Miller, stating that the appellant wanted to talk with police. Agent Miller asked Agent Ostermann to accompany him to the jail to interview the appellant. The agents arrived and sat down to talk with the appellant. Agent Miller asked the appellant if he wanted to talk with police. The appellant replied affirmatively. Agent Miller advised the appellant of his Miranda rights. The appellant stated that he understood his rights, then he signed a written waiver of rights form. Agent Steve Mitchell came in, and he and Agent Ostermann signed the waiver as witnesses. The waiver was executed at approximately 3:00 p.m.

The appellant told Agent Miller that he had injured his back in 2000. As a result, the appellant went to a "pain center" in Nashville where Dr. Chung prescribed Oxycontin pain killers. The appellant told the agents that he became addicted to pain killers. The appellant said that in January 2002, he began selling his Oxycontin pills to make money. The appellant gave the agents a list of the people to whom he regularly sold pills in 2002.

The appellant stated that in 2002, he primarily sold forty milligram Oxycontin pills for ten dollars each. However, in 2003, the appellant began selling twenty and eighty milligram Oxycontin pills. The appellant charged fifty dollars for each eighty milligram pill, twenty-five dollars for each forty milligram pill, and twelve dollars for each twenty milligram pill. The appellant began to sell regularly to more people, and he added their names to the list. The appellant estimated that he had earned $40,000 to $50,000 profit from his drug sales since 2002.

The appellant told the agents that he worked at H & H Small Engine Repair with Steve Hargrove. He maintained that Hargrove was involved with him in the distribution of Lortab pills, hydrocodone pills, and oxycontin pills; however, the bulk of their distribution was Oxycontin pills. The appellant indicated that Hargrove had "a little higher" ranking than the appellant. Hargrove sold the appellant the vehicle he was driving for $5,000. The appellant paid Hargrove $300 per month from his drug sales for the vehicle. Additionally, Hargrove supplied the appellant with a cellular telephone, but the appellant made the monthly payments for the use of the telephone. The appellant stated that occasionally Hargrove gave him Lortab pills to sell, or Hargrove purchased Oxycontin pills from the appellant at a discount to resell.

Agent Bill Ostermann testified that he worked for the Marshall County Sheriff's Department

but was assigned to work as an agent for the 17th District Drug Task Force. Agent Ostermann stated that on October 3, 2003, he accompanied Agent Miller to conduct an interview of the appellant. At the beginning of the interview, Agent Miller advised the appellant of his Miranda rights, and the appellant signed a written waiver of his rights.

The appellant told the agents about his involvement in drug activity. The appellant recounted that in 2000, he went to the Vanderbilt Pain Management Clinic where Dr. Chung prescribed Oxycontin pills to treat pain relating to the appellant's back injury. The appellant became addicted to the pills. In January 2002, the appellant began selling forty milligram Oxycontin pills for ten dollars each. He listed his customers for the agents. In 2003, the appellant began selling eighty milligram Oxycontin pills for fifty dollars each, forty milligram Oxycontin pills for twenty-five dollars each, and twenty milligram Oxycontin pills for twelve dollars each. The appellant opined that he had made $40,000 to $50,000 profit from pill sales since 2002.

The appellant also provided the names of the customers to whom he sold in 2003. Among the names on the list were Little, Hargrove, and Robert Tankersley. The appellant told the agents that he sold a forty milligram Oxycontin pill to Tankersley for twenty-five dollars cash just fifteen minutes prior to his arrest. When the appellant was arrested, police discovered twenty-five dollars in cash on his person. The appellant stated that Hargrove gave him money to help him purchase a vehicle. The appellant was repaying Hargrove with money and pills.

Donna Flowers, a forensic chemist with the TBI crime laboratory, testified that she received four pills for forensic testing relating to the instant case. After testing, she determined that each pill contained forty milligrams of oxycodone, brand name Oxycontin, a Schedule II controlled substance. The pills were sustained release or time release tablets.

The appellant testified that on November 13, 2002, he lived at 803 Marshall Street, and he worked as a mechanic. He kept "junk" cars at his home to repair and then sell. Additionally, the appellant received a Social Security disability check. In November 2003, the appellant was under the care of Doctors Curtis Buchheit and Frederick Wade. Dr. Buchheit had prescribed Oxycontin, Percocet, and Soma for the appellant.

On November 13, Little and another man came to see the appellant. Two other men, Bob Davis and Jim Reed, were already at the appellant's residence. Little told the appellant that his car had been overheating. The appellant went outside to look at Little's vehicle. While the appellant looked under the hood of Little's vehicle, Little spoke with Davis. The appellant stated that no one asked him for drugs, he did not give anyone drugs, and he did not see a drug exchange while Little was at his residence.

The appellant testified that a few days after he was arrested, he called his wife and asked if she could arrange for him to receive his medication in jail. Shortly thereafter, Agents Miller and Ostermann came to speak with the appellant. The appellant believed that his wife had called them about his medication. The agents asked if the appellant would like to make a statement, and he

4

declined, stating that he only wanted to talk about his medication. The appellant denied that he confessed to selling drugs and further denied providing a list of his customer's names.

Based upon the foregoing evidence, the appellant was convicted of selling a Schedule II controlled substance, oxycodone. He was designated a Range III persistent offender and received a ten-year sentence. On appeal, the appellant challenges the sufficiency of the evidence and the denial of probation.

## II. Analysis

### A. Sufficiency of the Evidence

The appellant first complains that the evidence was insufficient to establish that he sold oxycodone, specifically alleging that the proof against him was circumstantial and did not exclude other possible theories except that of guilt. On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

It is well-established that a guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 292-93 (Tenn. Crim. App. 1999). Moreover, while a guilty verdict may result from purely circumstantial evidence, in order to sustain the conviction the facts and circumstances of the offense "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the [appellant]." State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971).

Black's Law Dictionary 577 (7th ed. 1999) defines direct evidence as "[e]vidence that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption." Direct evidence is also considered to be "[a] witness's statement that he or she perceived a fact in issue by one of the five senses, or that the witness was in a particular physical or mental state." Id. at 579. Additionally, we note that mental states are most commonly proven by circumstantial evidence, with the trier of fact making inferences from attendant circumstances. See State v. Jeffrey Antwon Burns, No. M1999-01830-CCA-R3-CD, 2000 WL 1520261, at *3 (Tenn. Crim. App. at Nashville, Oct. 13, 2000). On appeal, the appellant admits that the evidence against

him is "partially circumstantial." Yet, he argues that "the facts and circumstances of [his] mental state are not so closely interwoven and connected that a conviction will stand."

The appellant was convicted of knowingly selling oxycodone, a controlled substance. See Tenn. Code Ann. §§ 39-17-417(a)(3), -408(b)(1)(N) (2003). The evidence against the appellant at trial was strong. Agent George, who was present during the offense, testified that he saw Little request pills from the appellant. The appellant obtained the pill bottle, dispensed four pills, and handed the pills to Little. Little gave the appellant sixty dollars for the pills, which money the appellant accepted. Testing revealed that each of the pills contained forty milligrams of oxycodone, a Schedule II controlled substance. From the foregoing, we conclude that a reasonable jury could have determined that the appellant knowingly sold a controlled substance. Therefore, the evidence is sufficient to sustain the appellant's conviction.

B. Sentencing

As his final issue, the appellant contends that the trial court erred in denying his request for probation. Appellate review of the length, range or manner of service of a sentence is de novo. See Tenn. Code Ann. § 40-35-401(d) (2003). In conducting its de novo review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statement by the appellant in his own behalf; and (7) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210 (2003); see also State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991). The burden is on the appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments. Moreover, if the record reveals that the trial court adequately considered sentencing principles and all relevant facts and circumstances, this court will accord the trial court's determinations a presumption of correctness. Id. at (d); Ashby, 823 S.W.2d at 169.

Initially, we note that while the appellant couches his argument in terms of the trial court's denial of his request for probation, we can find no such request in the record. Regardless, at the time the appellant was sentenced, an offender was eligible for probation if the sentence actually imposed was eight years or less. See Tenn. Code Ann. § 40-35-303(a) (2003).[2] Moreover, an appellant who is an especially mitigated or standard offender convicted of a Class C, D, or E felony is presumed to be a favorable candidate for probation. See Tenn. Code Ann. § 40-35-102(6). The appellant was sentenced as a Range III persistent offender to ten years. Therefore, he was not eligible for probation. This issue is without merit.

---

[2] In 2005, Tennessee Code Annotated section 40-35-303(a) was amended to provide that an offender is eligible for probation if the sentence imposed is ten years or less. The amendment "shall apply to sentencing for criminal offenses committed on or after June 7, 2005." Id., Sentencing Commission Comments.

### III. Conclusion

Finding no error, we affirm the judgment of the trial court.

_____
NORMA McGEE OGLE, JUDGE